UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JOSEPH ZICHERMAN

               Plaintiff,

       v.

THE BEAR STEARNS COMPANIES INC.,
ALAN D. SCHWARTZ,
SAMUEL L. MOLINARO, JR.,
ALAN C. GREENBERG, and
JPMORGANCHASE & CO.,

             Defendants.

**'08 CIV 6995**

**COMPLAINT**

08 CV

ECF Case
Jury Trial Demanded

Plaintiff, Joseph Zicherman, through his attorneys, Liddle & Robinson, L.L.P., brings this action under §10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 thereunder and §20(a) of the Securities Exchange Act of 1934 against Defendants, and alleges for his Complaint as follows:

## THE PARTIES

1.      Plaintiff, Joseph Zicherman ("Zicherman"), is an individual and resides at 1056 Fifth Avenue, Apt. 17A, New York, New York 10028.

2.      Zicherman worked for over twenty (20) years at Morgan Stanley, where he was a Principal, managing money for high net worth clients. Zicherman left Morgan Stanley in 1998 and is currently self-employed and manages his personal assets.

3.      Defendant The Bear Stearns Companies Inc. (BSC), through its broker-dealer and international bank subsidiaries, provided investment banking, securities

1

and derivatives trading, clearance, and brokerage services worldwide.    BSC maintained its headquarters in New York City.

4.    On May 30, 2008, Defendant JPMorgan Chase & Co. ("JPM") acquired BSC and is liable for all of its obligations.

5.    Defendant Alan D. Schwartz ("Schwartz") was, at all relevant times, President and Co-Chief Operating Officer of BSC.

6.    Upon information and belief, based on BSC's public filings, during the week ending March 14, 2008, Schwartz owned at least 1,026,680 shares of BSC stock.

7.    Defendant Samuel L. Molinaro, Jr. ("Molinaro") was, at all relevant times, Chief Financial Officer, Chief Operating Officer and Executive Vice President of BSC.

8.    Upon information and belief, based on BSC's public filings, during the week ending March 14, 2008, Molinaro owned directly or indirectly at least 82,683 shares of BSC stock.

9.    Defendant Alan C. Greenberg ("Greenberg") was, at all relevant times, the Chairman of the Executive Committee of BSC.

10.    Upon information and belief, based on BSC's public filings, during the week ending March 14, 2008, Greenberg owned at least 15,000 shares of BSC stock.

## INTRODUCTION

11.    The allegations set forth in paragraphs 12-27 regarding the events that unfolded at BSC during the week of March 10, 2008 are made "upon information

and belief" and are based primarily on three front-page stories in the *Wall Street Journal* published from May 27-29, 2008.

12.    On Sunday March 16, 2008, in order to avoid going out of business or filing for bankruptcy protection, BSC agreed to be acquired by JPM at the nominal price of $2 per share.

13.    Starting on Monday March 10, 2008 and continuing through Friday March 14, 2008, BSC, Schwartz, Molinaro and Greenberg made public statements in the press concerning BSC's financial condition, liquidity and business plans, which statements were intended to bolster and inflate BSC's stock price and to quell market rumors that the firm was experiencing a crippling liquidity crisis as a consequence of losses in its investments in collateralized debt obligations (CDO).  These statements were materially false and misleading, because at the very time these statements were being made, BSC was in fact undergoing a massive liquidity crisis that resulted by March 13 in the firm simultaneously preparing a bankruptcy petition and engaging in discussions to sell itself to JPM, and by March 16 agreeing to sell itself to JPM for a nominal amount. As a result of his reliance on Defendants' false and misleading statements and omissions, Zicherman purchased 4,000 shares of BSC stock on March 14, 2008 and subsequently lost $84,276 when he sold the shares later on March 14, 2008.

## FACTS

14.    On Monday March 10, 2008, Defendants were put on notice that BSC was in financial difficulty when one of its lenders, Rabobank Group, informed BSC at around 11:30am that day that it would not renew a $500 million loan due later that

3

week. This decision also implied that it would not renew an additional $2 billion credit agreement later that week.

      15.    Despite what Rabobank Group told BSC on March 10 (which was not disclosed publicly), Defendant Greenberg, in a March 10, 2008 interview on CNBC, dismissed reports in the media concerning BSC's liquidity troubles, stating that they were "ridiculous, totally ridiculous."

      16.    On March 10, 2008, some of BSC's trading partners tried back out of transactions with the firm. For example, BSC's hedge-fund clients contacted Deutsche Bank to see if Deutsche Bank would purchase contracts that these clients had signed with BSC.

      17.    Also on March 10, 2008, Defendant Schwartz, in a press release issued on behalf of BSC, said that "...there is absolutely no truth to the rumors of liquidity problems," and that BSC's "...balance sheet, liquidity, and capital remain strong."

      18.    On March 10, 2008, BSC's share price closed at $62.30.

      19.    On March 11, 2008, ING Groep NV advised BSC that it was withdrawing approximately $500 million in financing that it had extended to BSC.

      20.    Despite the ING Groep NV's decision, which was not disclosed publicly, Defendants' false and misleading statements continued on March 11, 2008. During an interview on CNBC, Defendant Molinaro falsely and misleadingly asserted that rumors that BSC faced a credit crisis were false. He stated: "Why is this happening? I don't know how to characterize it. If I knew why it was happening I would do

something to address it. I've spent the day trying to track down the source of the rumors, but they are false. There is no liquidity crisis. No margin calls. It's all nonsense."

21.    On March 11, 2008, BSC's share price closed at $62.97.

22.    On March 12, 2008, Defendant Schwartz stated misleadingly on CNBC television that "Some people could speculate that Bear Stearns might have some problems... since we're a significant player in the mortgage business. None of those speculations are true," and "Part of the problem is that when speculation starts in a market that has a lot of emotion in it, and people are concerned about the volatility, the people will sell first and ask questions later, and that creates its own momentum," and "We finished the year, and we reported that we had $17 billion of cash sitting at the bank's parent company as a liquidity cushion. As the year has gone on, that liquidity cushion has been virtually unchanged."

23.    On March 12, 2008, BSC stock closed at $61.58 per share.

24.    On March 13, 2008, a number of BSC clients began withdrawing funds from BSC, including D.E. Shaw & Co., which withdrew approximately $5 billion.

25.    On the evening of Thursday March 13, 2008, Robert Upton, BSC's treasurer, informed Defendant Molinaro that BSC had only $5.9 billion in cash on hand, down from $18.3 billion the previous Friday (March 7, 2008), and owed Citigroup $2.4 billion. This meant that BSC had available cash of $3.5 billion, representing an 81% decline in just five business days.

26.    On March 13, 2008, BSC stock closed at $57.00 per share.

27.    After the market closed on Thursday March 13, 2008, Schwartz called JPM's CEO Jamie Dimon to seek financing and/or to discuss selling BSC to JPM

and arranged an emergency Board of Directors' meeting, during which the BSC Board of Directors authorized an emergency bankruptcy filing. BSC also began discussions with the Federal Reserve Bank to discuss financing.

28.    At around 6:44am on March 14, 2008, JPM prepared a draft press release that was circulated to (among others) its General Counsel Stephen Cutler and Thomas C. Baxter, Jr. (the general counsel and executive vice president of the legal group at the Federal Reserve Bank of New York) that stated: "Today, JPMorgan Chase & Co. announced that, in conjunction with the Federal Reserve Bank of New York, it has agreed to provide secured funding to Bear Stearns, as necessary, for an initial period of up to 28 days. Through its Discount Window, the FRBNY will provide back-to-back financing to JPMC and has agreed to bear the counterparty, credit and price risk associated with the transaction. Accordingly, JPMC does not believe this transaction exposes its shareholders to any material risk. The Fed has agreed to waive all Section 23A requirements otherwise applicable to JPMC with this funding. JPMC is currently exploring with Bear Stearns the possibility of providing more permanent financing or purchasing the company."

29.    At around 9:00 a.m. on March 14, 2008, JPM issued a press release press stating: "Today, JPMorgan Chase & Co. (NYSE: JPM) announced that, in conjunction with the Federal Reserve Bank of New York, it has agreed to provide secured funding to Bear Stearns, as necessary, for an initial period of up to 28 days. Through its Discount Window, the Fed will provide non-recourse, back-to-back financing to JPMorgan Chase. Accordingly, JPMorgan Chase does not believe this transaction

exposes its shareholders to any material risk. JPMorgan Chase is working closely with Bear Stearns on securing permanent financing or other alternatives for the company."

30.    At around 9:21 a.m. on March 14, 2008, BSC issued a press release stating: "The Bear Stearns Companies Inc. announced today it reached an agreement with JPMorgan Chase & Co. (JPMC) to provide a secured loan facility for an initial period of up to 28 days allowing Bear Stearns to access liquidity as needed. Bear Stearns also announced that it is talking with JPMorgan Chase & Co. regarding permanent financing or other alternatives. Alan Schwartz, president and chief executive officer of The Bear Stearns Companies Inc., said, 'Bear Stearns has been the subject of a multitude of market rumors regarding our liquidity. We have tried to confront and dispel these rumors and parse fact from fiction. Nevertheless, amidst this market chatter, our liquidity position in the last 24 hours had significantly deteriorated. We took this important step to restore confidence in us in the marketplace, strengthen our liquidity and allow us to continue normal operations.' The company can make no assurance that any strategic alternatives will be successfully completed."

31.    Neither BSC's nor JPM's issued press releases reflected in sum or substance the language in the JPM draft press release that JPM was "exploring with Bear Stearns the possibility of ... purchasing the company." Moreover, neither press release reflected the fact that BSC's Board of Directors had authorized a bankruptcy filing.

32.    In reliance on the truthfulness and completeness of the Defendants' public statements from March 10-14, 2008, Zicherman placed an order before the market opened on March 14, 2008 to purchase 4,000 shares of BSC stock through his brokerage account at Goldman, Sachs & Co.

33.     Specifically, Zicherman made his decision to purchase the BSC shares set forth in paragraph 34 (below) after: (a) hearing the (i) March 10 comments Greenberg made on CNBC (paragraph 15, above) and (ii) hearing the March 12 comments Schwartz made on CNBC (paragraph 22, above); (b) reading the press release BSC issued at around 9:21 a.m. March 14, 2008 (paragraph 30, above) and without knowledge that BSC was in fact (i) prepared to file for bankruptcy protection, (ii) in discussions with JPM to sell itself to JPM and (iii) had suffered a massive depletion of its cash position over the preceding week contrary to the public statements made during the week of March 10, 2008; and (c) after generally being aware the BSC was issuing public statement during the week of March 10 that it did not have liquidity problems.

34.     With the insight of over twenty years at Morgan Stanley as a professional money manager and after an additional ten years of experience managing his own money, Zicherman believed that the Defendants were being truthful and complete in their public statements and that based on BSC's press release issued at around 9:21am on March 14, 2008 that BSC's stock price would go up and would be sustained. Accordingly, before the market opened on March 14, Zicherman placed the order for his purchase of 4,000 shares of BSC stock. Zicherman's orders were processed at the start of trading on March 14, 2008 and he purchased the following shares of BSC:

        (a) 2,000 shares @ $64.00 per share;

        (b) 100 shares @ $63.14 per share;

        (c) 100 shares @ $63.14 per share;

        (d) 100 shares @ $63.22 per share;

        (e) 300 shares @ $63.20 per share;

    (f) 300 shares @ $63.15 per share;

    (g) 100 shares @ $63.10 per share; and

    (h) 1000 shares @ $56.12 per share.

35.     Although BSC's share price initially rose after the market opened on March 14, 2008 from its close of $57.00 on March 13, 2008, it almost immediately began to plummet.

36.     Beginning at 9:52am and concluding at 10:12am on March 14, 2008, Zicherman sold the shares of BSC common stock that he had purchased that morning as follows:

    (a) 100 shares @ $45.84 per share;

    (b) 600 shares @ $45.78 per share;

    (c) 200 shares @ $45.83 per share;

    (d) 100 shares @ $45.78 per share;

    (e) 100 shares @ $43.81 per share;

    (f) 100 shares @ $43.67 per share;

    (g) 100 shares @ $43.67 per share;

    (h) 700 shares @ $43.66 per share; and

    (i) 2,000 shares @ $36.81 per share.

37.     In total, Zicherman lost $84,276.32 through his purchase and subsequent sale of BSC common stock on March 14, 2008.

38.     Over the weekend of March 15-16, 2008, BSC agreed to sell itself to JPM for $2 per share. The sale was finalized on May 30, 2008 for $10 per share.

39.     On March 14, 2008, BSC's shares closed at $30 per share.

40. On March 17, 2008, BSC announced that it agreed to be acquired by JPM. On this news, BSC's share price fell to a close of $4.81.

41. Upon information and belief, the public comments made by Defendants during the week of March 10, 2008 concerning BSC's liquidity inflated the price of BSC's stock. Once the true condition of BSC's financial condition became known publicly, the market adjusted the price downwards on March 17, 2008 to $4.81 per share.

## AND AS FOR A FIRST CAUSE OF ACTION

(Violation of §10(b) of the Securities Exchange Act of 1934 and Rule l0b-5 Against All Defendants)

42. Plaintiff incorporates ¶¶1-41 by reference.

43. Defendants disseminated or approved the false statements specified above regarding BSC's financial condition, business plans and liquidity, which they knew were, or recklessly disregarded as being, misleading in that they contained misrepresentations and they failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

44. Defendants violated § 10(b) of the 1934 Act and Rule 10b-5 in that they:

(a) employed devices, schemes and artifices to defraud;

(b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c) engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiff in connection with his purchase of BSC common stock.

45.    Defendants Schwartz, Molinaro and Greenberg each held directly or indirectly a substantial number of BSC shares during the week ending March 14, 2008. Each stood to benefit in a concrete and personal way by making misrepresentations and incomplete disclosures and/or not correcting disclosures made by each other regarding BSC's financial condition and liquidity during the week ending March 14, 2008 in order to bolster BSC's stock price, because if BSC stock price dropped the value of their stock holdings would decline dramatically in value.

46.    Defendants Schwartz, Molinaro and Greenberg each either knew of information or had access to information that their public statements regarding BSC's financial condition and liquidity were inaccurate and/or failed to check information regarding the firm's actual financial condition and liquidity that they had a duty to monitor, especially because they were making public statements on BSC's behalf regarding the firm's financial condition and liquidity that were intended to convey to the investing public that the firm did not have liquidity problem.

47.    All Defendants had a duty to disclose, by the evening of March 13, 2008 or the morning of March 14, 2008 before the market opened, that BSC was experiencing a severe liquidity crisis, had authorized a bankruptcy filing and was in discussions with JPM to sell BSC to JPM, so as to make not misleading, inaccurate or incomplete their prior statements concerning BSC's liquidity and the business plans that the firm was in fact considering, including that it was considering selling itself to JPM.

48.     Through the press release that BSC issued before the market opened on March, 14, 2008 and the comments attributed to Schwartz in that press release, BSC and Schwartz left the misleading impression that BSC had averted its liquidity crisis and could return to normal operations, when in fact the firm was not financially sound and was engaged in discussions to sell itself to JPM.

49.     Defendants' statements from March 10-14, 2008 artificially inflated BSC stock price and Plaintiff suffered damages in that, in reliance on the statements and omissions and the integrity of the market, he paid artificially inflated prices for BSC common stock.  Plaintiff would not have purchased BSC common stock had he been aware that its market prices had been artificially and falsely inflated by Defendants' misleading statements and omissions.

## AND AS FOR A SECOND CAUSE OF ACTION

(For Violation of §20(a) of the Securities Exchange Act of 1934)

50.     Plaintiff incorporates ¶¶1-49 by reference.

51.     The Individual Defendants (i.e., Schwartz, Molinaro and Greenberg) acted as controlling persons of BSC within the meaning of §20(a) of the 1934 Act. By reason of their positions with BSC, the public statements they made on the firm's behalf, and their ownership of BSC common stock, the Individual Defendants had the power and authority to cause BSC to engage in the wrongful conduct complained of herein.  By reason of such conduct, the Individual Defendants are liable pursuant to §20(a) of the 1934 Act.

## JURISDICTION AND VENUE

52.    This Court has original jurisdiction (28 U.S.C. § 1331) over the allegations set forth in this Complaint because the claims arise under the laws of the United States.

53.    Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in the judicial district where this Court is located.

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

A.    On the First and Second Causes of Action, compensatory damages in the amount of $84,276 plus interest and legal fees and costs;

B.    Such other and further relief as the Court deems proper under the circumstances.

Dated:    New York, New York
          August 5, 2008

LIDDLE & ROBINSON, L.L.P.

By: _____
    Jeffrey L. Liddle (JL 8256)
    Ethan A. Brecher (EB 3425)
    David H. Feldstein (DF 0916)
Attorneys for Plaintiff
800 Third Avenue
New York, New York 10022
(212) 687-8500